BAKER *v.* STATE.

4148 · 137 S. W. 2d 938

Opinion delivered February 19, 1940.

*H. G. Leathers, A. G. Bush* and *W. R. Donham,* for appellant.

*Jack Holt,* Attorney General and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

BAKER, J. An information was filed in the circuit court for the western district of Carroll county, charging Norman Baker, who will hereinafter be referred to by name, or as appellant, or defendant, with the crime of libel. Upon trial there was a conviction with a fine of $2,500. This appeal is from that judgment of conviction. The information was based upon an open letter, allegedly written by Norman Baker to and about Mr. and Mrs. Ray Freeman, published in a local newspaper, Daily Times Echo. In the information setting forth the charge this open letter is copied in full.

"Information

"I, John K. Butt, prosecuting attorney of the Fourth Judicial Circuit of the state of Arkansas, of which said circuit the county of Carroll, and the western district thereof, is a part, in the name and by the authority of the state of Arkansas, upon information, upon my official oath, at the instance of and with the consent of Ray Freeman and Mrs. Ray Freeman, accuse the defendant, Norman Baker, of the crime of criminal libel, committed as follows:

"The said Norman Baker, in the said western district of Carroll county, Arkansas, on or about the 15th day of June, 1939, did unlawfully, wilfully and maliciously defame Ray Freeman and Mrs. Ray Freeman, by causing to be printed, and by writing and causing to be published of and concerning the said Ray Freeman and Mrs. Ray Freeman in the Daily Times Echo, a newspaper edited and published by W. E. Diehl in Eureka Springs, Carroll county, Arkansas, and having a general circulation therein, language tending to impeach the honesty, integrity, veracity and reputation of the said Ray Freeman and Mrs. Ray Freeman, which said language in words and figures is as follows, to-wit:

"An open letter to Mr. and Mrs. Ray Freeman and the Eureka Springs Boosters Association (By Norman Baker, personally):

"I address Mr. and Mrs. Ray Freeman in this manner so the citizens can understand the unfair and damaging methods they are using and I address the Eureka Springs Business Boosters, so they can, if they choose, take action against such persons who would stoop to such tactics. It is understood that I write this personally, without any connection with the Baker Hospital, but as an honest and progressive citizen, interested in the welfare and upbuilding of the community.

"Mr. and Mrs. Freeman, I charge both of you with underhanded methods, in your attempt to destroy the business of the Baker Hospital which I founded here. I charge you with telling prospective patients who stop at your camp, discriminating statements in an effort to turn them back home, to discredit the hospital doctors. I charge you with pure falsehoods against the hospital doctors. I charge you with actions unworthy of being a citizen of this city, I charge you with actions that should bring condemnation upon you by every true and patriotic citizen of the community.

"I freely state that I have affidavits sworn to, to prove all my assertions and such affidavits are open for any citizen to read if they will call at the Baker Hospital office, that I have also caused to be presented, these affidavits to the business people before the Eureka Springs Boosters Association; thereof, I know whereof I speak.

"You are a business man of this city, Mr. Freeman, you own stock in the Berryville Wholesale Grocery, conduct a swimming pool with a charge after the city pool was closed officially, you sell groceries to the local stores, used to sell such to the Baker Hospital who discontinued all business with you, and do you realize that these business people support you by buying from your wholesale house. Do you realize that every person you turn away from this city means a loss to every business person in town, that those persons you turn away would

become patients that stay here for weeks and buy groceries, rent rooms, buy clothes, souvenirs and what nots.

"Could you blame people who suffer from your actions, especially as an official, or the women who belong to the same clubs as Mrs. Freeman, to condemn both of you and refuse both their support in anything?

"You are in the habit of telling prospective patients who stop at your camp, according to affidavits I have, that they should not go to the Baker Hospital without investigating about town; about the horrible place it is; about others who came here and went back home, thus deserting our city and spreading unfavorable impressions of the city to the folks back home; that you would not go to the Baker Hospital for anything in the world, that it is not a fit place; that some of the folks are 'no good folks,' that there are no licensed doctors at the hospital, etc.

"Still you take these poor folks' money for your tourist camp room, you are eager to get it, you would get more if you kept your mouth shut and spoke only the truth. You have practiced a seemingly boss rule in your city office, you have literally defied the people to put you out, you are all for Ray Freeman, you know of city affairs that would make bad reading; you know the citizens support you and still you and Mrs. Freeman deliberately try to destroy the biggest and finest institution that ever came to your city since the days of the Frisco Lines opened the Crescent Hotel. Is wreck or ruin your motto?

"To you members of the Business Boosters Association, do you realize and Mr. and Mrs. Freeman's actions are tearing down the good the Baker Hospital is doing? Do you realize that every person they turn away by discouraging the prospective patients, means that they came here all enthused from our radio talks, regarding the Baker Hospital, the city, that their returning home discouraged robs you of not only the patient, but their friends and relatives who came with them, that such people are the ones who buy your merchandise, your groceries, rent your rooms, buy your gas, oil, garage and all other things. If they could succeed in turn-

ing all away, would not your city be in depression and the hospital closed? Some of you buy your goods from the Freeman Store as the Baker Hospital used to do, and do you think his actions in robbing you of customers by turning away people from the city is helping you?

"Surely not, and I feel that every member of your association, every citizen should protest such actions and I think with this exposed showing Mr. Freeman is not acting for the best interest of the city, that he as a city official should resign.

"Wouldn't your association and the citizens be justified in ousting him from office and running your city in a decent manner? Mr. and Mrs. Freeman cannot deny the charges made as I have affidavits and will meet both of them in any public meeting and prefer with proofs these charges I have mentioned.

"To the Chamber of Commerce I say this: Do you approve of one of your members, Mr. Ray Freeman, doing these things? If so, then what good does it do to spend the people's money you collect for advertising for people to come to the city when your own member attempts to turn them away with a bitter taste in their mouth. Shouldn't Mr. Freeman be expelled from your association and shouldn't you assist in removing him from city office? With new officials in, the city swimming pool may come back to the kiddies to whom it belongs, and many other things will come to light, with possibly charges against some that will be mighty serious. Can the citizens expect the Baker Hospital and other progressive citizens to give good co-operation as long as these ungentlemanly, underhanded and contemptible things exist?

"Norman Baker.

"Advertisement.

which words and language in their common acceptation are false, and tended to and did impeach the honesty, integrity, veracity and reputation of the said Ray Freeman and Mrs. Ray Freeman, who were at the time living, and the said Norman Baker did thereby unlawfully, wilfully, maliciously and falsely expose the said Ray Freeman and Mrs. Ray Freeman to public hatred, contempt

and ridicule, against the peace and dignity of the state of Arkansas."

The defendant first filed a demurrer, then a motion to quash the information, a motion to dismiss, then a motion for a bill of particulars. All of these several pleadings were denied or overruled by the trial court, except the prayer for a bill of particulars. Whereupon the prosecuting attorney filed a bill of particulars in which there was set forth in full the aforesaid open letter. Thereupon the defendant filed another motion to strike the bill of particulars, and, being overruled, a written plea was filed by him, the effect of which was: 1. That he is not guilty. 2. That the alleged defamatory statements are true. 3. That the alleged defamatory statements are absolutely privileged. 4. That the alleged defamatories are qualifiedly privileged. 5. That the defendant is a citizen of the United States. A trial and conviction upon the information filed therein would result in depriving him of his liberty and property without due process of law in violation of the 14th Amendment to the Constitution of the United States. 6. The defendant is a citizen of the state of Arkansas. A trial and conviction upon the information would result in depriving him of his liberty and property in violation of art. 2, § 8, of the Constitution of the State of Arkansas.

The defendant thereupon attempted to waive trial by jury and was overruled in this matter because of the failure of the prosecuting attorney to agree thereto. The defendant then made objections to the introduction of evidence in the case, said objections being based upon matters raised by the demurrer, motion to dismiss and the final pleas.

It can perhaps serve no good purpose to set forth in minute detail all of the many and several objections made to the information upon which the defendant was tried.

After careful and intensive study, we feel that justice will be served and all rights of the defendant will be protected and preserved by the shortest statement possible under the circumstances indicating the substantial questions presented and argued.

It is urged that the information is bad. (1) Because it was indefinite. (2) Because it did not give the notice sufficient to enable him to defend. (3) Because the court erred in not requiring a definite bill of particulars. (4) Because it contained no allegation of fact which is libelous *per se*. (5) Because the article published shows on its face that it was privileged.

Whatever may have been formerly argued as to the sufficiency or validity of this information, under the discarded practice in this state may not now be regarded as entirely proper under our present form of criminal procedure. We have heretofore given due consideration to initiated act No. 3, adopted November 3, 1936 (Acts of 1937, p. 1384), which permits the prosecuting attorney to file an information or to proceed against one by charging him with having committed some offense. This act was provided for by amendment No. 21, adopted November 3, 1936. It is provided that a defendant may be charged in the simplest language with having committed a crime, it being necessary only that the charge in effect be such as to advise the defendant of the nature of the crime so that he may prepare himself to present whatever defense he may have. Instead of the particularity of the old form of charging by indictment, the act itself furnishes a new form and accepts this as being sufficient to charge one with murder: "Richard Roe did kill and murder John Doe." *Moran* v. *State,* 179 Ark. 3, 13 S. W. 2d 828.

Of course, this act is applicable in the matter of charging a defendant with having committed any other crime than that of murder, so in this case the defendant is charged with having written the open letter, which is set out in full and which, of course, contains not only the matter alleged to have been libelous, but some other matters connected or associated with the particular offense charged against the defendant. The defendant, in writing the letter set forth the details, the basis therefor, the background with associated and related facts as a reason for his writing the so-called open letter, and published it in a newspaper. The mere statement of these facts as they appear from a study of the instrument itself is conclusive upon the point argued so seriously, that the court

erred when it did not require the prosecuting attorney to furnish a bill of particulars. The defendant wrote his own bill of particulars, gave his own reasons or excuses for writing and publishing the open letter concerning which he is charged. Had the prosecuting attorney selected and set forth only particular parts or portions of the aforesaid letter and had he failed to show the connection and relation thereof to other portions, it may have been possible to have fallen into error in the failure so to present the charge of libel as to preclude other or further prosecutions growing out of the same letter as written and prepared by the defendant.

The court might properly have denied or refused appellant's request for the bill of particulars. The argument to the effect that the charge of libel is indefinite is based upon the contention that the pleader did not select from the letter particular portions thereof as being libelous as distinguished from the other connected parts set forth by the defendant himself as explanatory of his own conduct. He begins his letters as quoted above, with the following introduction: "An open letter to Mr. and Mrs. Ray Freeman and the Eureka Springs Boosters Association. (By Norman Baker, personally)."

The next paragraph is one in which the writer identifies himself and sets forth in his own manner the purposes of the letter. We quote only a part of this first paragraph as the whole letter has hereinbefore been set out. The part to which we now give attention is "I address Mr. and Mrs. Ray Freeman . . . I address the Eureka Springs Business Boosters. . . . It is understood that I write this personally without any connection with the Baker Hospital."

The next paragraph is also written in a form in which the author uses also the first person singular. It is: "I charge both of you with underhanded methods, in your attempt to destroy the business of the Baker Hospital which I founded here. . . . I charge you with telling prospective patients who stop at your camp discriminating statements in an effort to turn them back home, to discredit the hospital doctors. I charge you with pure falsehoods against the hospital doctors. I charge

you with actions which should bring condemnation upon you by every true and patriotic citizen of the community.''

The parts of the open letter above quoted, some for the second time, will serve very well to illustrate the futility of some of the suggestions argued so fully and forcefully by the defendant. Defendant has chosen for example the sentence wherein the appellant has said, ''I charge you with telling prospective patients who stop at your camp, discriminating statements in an effort to turn them back home, to discredit the hospital doctors.''

We agree that if this particular sentence be severed and read separated from its context, it would perhaps be of little consequence, but left in the setting in which the author placed it, its meaning would not be misunderstood, nor is there real necessity for explanation. One may readily see that the word ''discriminating'' was used in the sense of disparaging, depreciating and perhaps dishonestly undervaluing. Had the prosecuting attorney charged libel based on that sentence alone, learned counsel's insistence that without innuendo or proper pleading, by way of inducement, the charge would not be understood, but pleading by way of innuendo or setting forth matter by way of inducement, explanatory of the phraseology used, is by no means necessary when the particular matter is considered in its relation to the context. A part of this same context is, ''I charge you with pure falsehoods against the hospital doctors.'' It did not serve the author's purpose to charge merely that Mr. and Mrs. Freeman had told untruths or falsehoods concerning the doctors at the Baker Hospital, but the jury might well have found from the expression used that it was the intention of the writer not only to say that Mr. and Mrs. Freeman had not told the truth in regard to the doctors, but he meant to emphasize the fact that they had intentionally and knowingly told falsehoods.

If the next paragraph in appellant's letter be read, it will be found that he is not only making these statements, but he is asserting in a most positive manner that he is ''able to prove all my assertions.'' He tells of the affidavits he has in his possession and his willingness to

show them to people that may be interested. Certainly one who assumes the superior position of being so well informed on the subject concerning which he was writing and publishing his conclusions and deductions from the facts in his possession was not misled or misinformed to the extent that he was unable to defend himself against the charge of libel made against him soon thereafter. We must and do conclude that no innuendo or qualifying explanation was necessary in this case notwithstanding the holdings and authorities under the more ancient practice. Even an indictment substantially in the language of the statute is legally sufficient. *Moran* v. *State,* 179 Ark. 3, 13 S. W. 2d 828.

There are other matters in the open letter as unfounded as the ones mentioned, but it is unnecessary to pursue such subjects further.

The next matter most seriously insisted upon by counsel for appellant is that this open letter was privileged and, therefore, could not become a proper basis for this prosecution. Of course, there may be many charges made by one person against another under such conditions that the charges would be deemed to be privileged and not a proper basis for prosecution to redress the alleged grievance. The best examples of privileged communications are furnished by expressions or arguments in legislative assemblies, or in the trial of cases, or it may be in necessary pleadings filed in the courts raising issues for trial and determination by the tribunals whose jurisdiction has been invoked. Even editorial writings or such really public expressions of opinions in regard to purely public affairs may be privileged or, at least, qualifiedly so, but no such condition as any of these mentioned prevails in this case.

It is argued in the briefs that the Baker Hospital at Eureka Springs is an institution depending upon the public for support and that the appellant here had the right to defend this institution from unjust and malicious attacks, as contained in false or untrue statements. Such a conclusion does not arise out of the issues that have been presented, either upon the trial in the lower court or upon this appeal. There is no showing whatever that

the Baker Hospital is a public institution. We are willing to presume that it must depend upon the public for support, but in like manner, so must any other community enterprise, whether it be a department store, barber shop, or a meat market. One is no more dependent upon public approval for patronage than another, and yet any one of these probably would be found to be a private enterprise, founded and operated for the profit that would accrue to those in charge thereof.

There is nothing in the record that causes the hospital to appear as an organized charity, conducted in the public interest, and, therefore, perhaps entitled to more protection than is a purely commercial organization.

In spite of the theory upon which this case has been argued, we find that the writer of the letter takes an entirely different viewpoint from that presented by learned counsel in regard to this matter of privilege. He assumes full responsibility for the letter and attempts, contrary to the viewpoint argued, to absolve the Baker Hospital from any or all blame that might follow on account of the publication of the letter. "It is understood that I write this personally, without any connection with the Baker Hospital, but as an honest and progressive citizen, interested in the welfare and upbuilding of the community."

We find from this quoted part of the open letter the assertion of those purely altruistic principles which motivate and inspire the ideal citizen whose sole object is the upbuilding of the community in which he lives. If this is really the attitude of the defendant he was in position to establish that fact as one must believe by his assertion, "I freely state that I have affidavits, sworn to, to prove all my assertions and such affidavits are open for any citizen to read if they will call at the Baker Hospital office; that I have also caused to be presented these affidavits to the business people before the Eureka Springs Boosters Association, thereof, I know whereof I speak."

Besides the conclusions above reached it is not improper to suggest that the appellant was by no means deceived or not properly informed as to the issues he had

created when the propriety of his open letter was questioned. He did not rely solely upon these affidavits, but he brought and had present in court and presented upon the trial of the case the affiants as his witnesses.

The foregoing, we think, shows conclusively that the open letter was not a privileged communication, and it was not so regarded by the appellant in the preparation or trial of his case. Indeed, he boasted of the fact that he had a complete defense as contained in the affidavits in his possession. This, of course, was but another method of asserting the truth of the charges he had made.

The foregoing facts are arrived at and determined from the letter itself, except as to the argument made upon the asserted basis or theory of counsel that the Baker Hospital was a public institution.

Some of the authorities which justify our conclusions as to matters privileged are epitomized in 17 R. C. L., p. 330, § 76. It is there said: "An absolutely privileged communication is one in respect to which, by reason of the occasion on which it is made, no remedy can be had in a civil action. The class of absolutely privileged communications is narrow, and is practically limited to legislative and judicial proceedings and other acts of state, . . ."

As to matters that were or may be qualifiedly privileged we have recourse to the case of *Bohlinger* v. *Germania Life Ins. Co.*, 100 Ark. 477, 140 S. W. 257, 36 L. R. A., N. S., 449, Ann. Cas. 1913C, 613, for an example and application. We decide there is not a qualifiedly privileged situation shown here.

We think it must appear, therefore, that the published article was one that was libelous *per se,* for the reason it "tends to impeach the honesty, integrity, or reputation . . . of one who is living and thereby expose him to public hatred, contempt and ridicule." There is a violation of Pope's Digest, § 3015. We find, also, in 17 R. C. L., p. 289, § 27: "It is well settled that written words charging a person with being a liar or uttering falsehoods are libelous *per se.*"

The next most important matter in issue is the evidence introduced on behalf of the state by which the state

attempted to prove by R. R. Thompson that he was familiar with and recognized the style of writing of Norman Baker. Mr. Thompson was first qualified by a showing that he had been the dean of the faculty at Crescent College at Eureka Springs, having served thirteen years as president thereof; that he had taught English in the said school for a time and was himself a university graduate. His testimony was to the effect that he had examined writings of Norman Baker; that he had read articles that Baker admitted writing; that he was familiar with Baker's method of speech and his style in written articles; that he had examined the so-called open letter and he recognized it as one written and prepared by the appellant, Norman Baker.

It is most seriously contended that the admission of this evidence is an innovation; that it was error seriously prejudicial for the court to have admitted such testimony; that it must be deemed such prejudicial error as to warrant a reversal. We do not agree. There can be no prejudice in that regard even if we should hold the evidence of Mr. Thompson inadmissible for the reason that the appellant himself settled the question of authorship of the article appearing over his name. It is, therefore, unnecessary to decide the admissibility of this evidence. He identifies himself as the founder of Baker Hospital. He also identifies himself as the holder of affidavits produced and offered at the trial of this case. Certainly there was no question for the jury to pass upon in this respect. The matter does not merit further consideration.

We have given due regard to all the instructions given by the court upon the trial of this case, and also we have considered those offered by the defendant, appellant here, and refused, and we find no error upon the part of the court in the giving of the instructions nor in the refusal to give others as requested.

The foregoing discussion of matters presented indicates, by settlement of the matters determined herein, our conclusions in this respect, and we think it barely possible that a separate discussion of each instruction and the determination in regard thereto would be of any value.

In order that this opinion may not be unduly extended, we hold appellant's contentions in regard to all these instructions are without substantial merit.

The only remaining matter is the amount of the fine as determined by the jury. The jury fixed the fine at $2,500. It might have been as high as $5,000, Pope's Digest, § 3016. We have on occasions given due consideration to the fines and penalties adjudged and we dare say that ordinarily there is little authority for holding that a fine or other penalty is so large that it must be deemed erroneous, so long as the fine remains in the limits fixed by the law.

Certainly this case does not belong to the class which would justify a ruling in that respect. We have for consideration an instance wherein a man connected with one of the largest enterprises in the community and recommending himself as "an honest and progressive citizen interested in the welfare and upbuilding of the community," making most serious charges against another business man of the same community, one who has received the respect and esteem of his people to the extent that he is one of the commissioners of the city, connected also with private enterprise, of perhaps some relative importance, as well as the wife of the last mentioned citizen, in the same manner, with perpetrating falsehoods, with pursuing underhanded, dishonest methods, doing wrong to others without justification, then admitting his authorship by offering to prove the truth of the charges and wholly failing in that respect according to the verdict of the jury.

The finding of the jury determined that the charges made against Mr. and Mrs. Freeman were wholly false, were unjust, and, therefore, not even qualifiedly privileged.

The defendant was living in the community where he was tried; the members of the jury doubtless knew him. At the same time they were acquainted with the two victims of the libelous assault. Most likely, the trial court and the jury understood best what would prevent a recurrence of an attack so unwarranted.

Since we find there is no substantial error, the judgment is affirmed.